## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **TERRY B. McCOWAN,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:17cv00044 |
| | ) | **REPORT AND RECOMMENDATION** |
| **NANCY A. BERRYHILL,** | ) | |
| **Acting Commissioner of** | ) | By:   Pamela Meade Sargent |
| **Social Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Terry B. McCowan, ("McCowan"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011, West 2012 & 2018 Supp.). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may

be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that McCowan protectively filed his current applications for DIB and SSI on November 20, 2012, alleging disability as of October 15, 2011, due to learning problems; blindness in the left eye; depression; anxiety; "nerves;" inability to concentrate; attention deficit hyperactivity disorder, ("ADHD"); and attention deficit disorder, ("ADD"). (R. at 247-48, 251-54, 269, 273.) The claims were denied initially and upon reconsideration. (R. at 141-43, 146-48, 154-58, 160-65, 167-69.) McCowan then requested a hearing before an ALJ. (R. at 170.) The ALJ held a hearing on July 12, 2016, at which McCowan was represented by counsel. (R. at 37-83.)

By decision dated October 5, 2016, the ALJ denied McCowan's claims. (R. at 20-31.) The ALJ found that McCowan met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2017. (R. at 22.) The ALJ found that McCowan had not engaged in substantial gainful activity since October 15, 2011, the alleged onset date.[1] (R. at 22.) The ALJ found that the medical evidence established that McCowan had severe impairments, namely a learning disorder; borderline intellectual functioning; vision deficiencies in the right eye;[2] depressive disorder; and anxiety disorder, but she found that McCowan

---

[1] Therefore, McCowan had to show that he was disabled between October 15, 2011, the alleged onset date, and October 5, 2016, the date of the ALJ's decision, in order to be eligible for DIB benefits.

[2] Listing 2.02 (loss of central visual acuity) requires that the remaining vision in the better eye after best correction is 20/200 or less. Listing 2.03 requires contraction of the visual field in

did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22-23.) The ALJ found that McCowan had the residual functional capacity to perform repetitive, unskilled work at all exertion levels that did not require him to work around hazardous machinery, unprotected heights, vibrating surfaces or to climb ladders, ropes or scaffolds; that did not require him to drive or to view a computer screen for more than one hour a day; that allowed him to wear eye protection; that did not require him to interact with the general public; and that did not require more than occasional interaction with supervisors and co-workers. (R. at 25-29.) The ALJ found that McCowan was unable to perform his past relevant work. (R. at 29.) Based on McCowan's age, education, work history and residual functional capacity, and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that McCowan could perform, including jobs as an assembler, a packer and an inspector/tester/sorter. (R. at 29-30.) Thus, the ALJ concluded that McCowan was not under a disability as defined by the Act, and was not eligible for DIB or SSI benefits. (R. at 31.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2018).

After the ALJ issued her decision, McCowan pursued his administrative appeals, (R. at 243, 361-63), but the Appeals Council denied his request for review. (R. at 1-5.) McCowan then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See*

---

the better eye with (a) the widest diameter subtending an angle around the point of fixation no greater than 20 degrees; (b) a mean deviation of -22 or worse, determined by automated static threshold perimetry as described in Listing 2.00(A)(6)(d); or (c) a visual field efficiency of 20 percent or less as determined by kinetic perimetry. Listing 2.04 (loss of visual efficiency) requires (a) visual efficiency of the better eye of 20 percent or less after best correction or (b) a visual impairment value of 1.00 or greater after best correction as described in 2.00(A)(8)(d). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 2.02-2.04 (2016).

20 C.F.R. §§ 404.981, 416.1481 (2018). This case is before this court on McCowan's motion for summary judgment filed June 21, 2018, and the Commissioner's motion for summary judgment filed July 20, 2018.

## II.  Facts

McCowan was born in 1988, (R. at 45, 247, 251), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). McCowan completed high school with a modified diploma for special education and he has past work as a stocker, a bagger, a cook, a customer service representative, a flagger and a truck helper. (R. at 45, 274-75.) He testified that he was fired from multiple jobs because of his inability to get along with co-workers and supervisors. (R. at 50-53.) McCowan stated that he could walk up to 50 feet; stand up to 10 minutes without interruption; sit up to 30 minutes without interruption; and lift items weighing no more than five pounds. (R. at 56-57.) He stated that he had difficulty passing tests while in school, and ultimately, someone had to read the questions to him for him to answer. (R. at 63-64.)

John Newman, a vocational expert, was present and testified at McCowan's hearing. (R. at 72-79.) Newman classified McCowan's past work as a flagger as unskilled, light work;[3] his work as a truck helper/hoisting laborer as semi-skilled, medium work;[4] and his work as a telephone order clerk as semi-skilled, sedentary

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2018).

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2018).

work.[5] (R. at 73-74.) Newman was asked to consider a hypothetical individual of McCowan's age, education and work history, who had the residual functional capacity to perform work at all exertion levels; who could not work around hazardous machinery, unprotected heights or on vibrating surfaces; who could not climb ladders, ropes or scaffolds or be required to drive; who could use a computer screen up to one hour a day; who would be allowed to wear eye protection; who could understand, remember and carry out simple instructions; who could perform repetitive, unskilled work that involved no interaction with the general public; and that allowed only occasional interaction with co-workers and supervisors. (R. at 74.) Newman stated that such an individual could not perform McCowan's past work, but that the individual could perform other jobs that existed in significant numbers in the national economy, including those of an assembler, a packer and an inspector/tester/sorter. (R. at 74-75.)  Newman stated that there would be no jobs available should the individual be unable to respond appropriately to supervision, co-workers and unusual work situations. (R. at 76.) Newman stated that the above-mentioned jobs would not require the individual to read and write. (R. at 77.) He stated that there would be no jobs available should the individual be off task greater than 10 percent of the workday. (R. at 78.) Newman stated that the above mentioned jobs did not require peripheral vision. (R. at 78.) He stated that there would be no jobs available should the individual be limited as indicated in psychologist Paige Cordial's assessment. (R. at 79, 690-92.)

---

[5] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2018).

In rendering her decision, the ALJ reviewed records from Dickenson County Public Schools; Eric Oritt, Ph.D., a state agency psychologist; Dr. Shirish Shahane, M.D., a state agency physician; Jo McClain, Psy.D., a state agency psychologist; Dickenson County Behavioral Health; Dr. Brett S. Compton, O.D.; Kathy Birchfield, M.Ed., a licensed senior psychological examiner; Dr. Jack K. Cox, II, M.D.; Mountain View Regional Medical Center, ("Mountain View"); Norton Community Hospital; Lonesome Pine Hospital, ("Lonesome Pine"); Appalachia Family Health; Dr. Gary C. Hubbard, O.D.; Crystal Burke, L.C.S.W., a licensed clinical social worker; Alysia Hoover-Thompson, Psy.D., a licensed clinical psychologist; and Paige Cordial, Psy.D., a licensed clinical psychologist.

On November 19, 1998,[6] a school psychological evaluation was performed to assess McCowan's levels of intellectual functioning. (R. at 334-39.) The Wechsler Intelligence Scale for Children-III, ("WISC-III"), was administered, and McCowan obtained a verbal IQ score of 82, a performance IQ score of 71 and a full-scale IQ score of 75. (R. at 335.) The evaluator noted that McCowan's true level of overall intellectual functioning fell in the range of 70 to 82. (R. at 336.) She noted that, if McCowan was tested at a later date, there would be a 95 percent chance that he would obtain a full-scale IQ score of 65 to 87. (R. at 336.) Test results revealed that McCowan was then-currently functioning within the below average range of intelligence. (R. at 339.) The evaluation did not indicate the presence of any specific handicapping condition that required special education services. (R. at 339.) However, school records indicate that McCowan was later placed in special education classes and was a candidate for the modified standard diploma. (R. at 340, 342.)

---

[6] McCowan was 10 years old and in the fifth grade at the time of the evaluation. (R. at 334.)

On January 14, 2008, McCowan presented the emergency room at Norton
Community Hospital with complaints of a chest injury following a motor vehicle
accident. (R. at 427-29.) He complained of neck, chest and back pain. (R. at 428.)
A CT scan of McCowan's cervical spine showed mild scoliosis with loss of normal
lordotic curvature and mild asymmetry in the space between the odontoid and
lateral facets of the C1 disc space. (R. at 426.) McCowan was diagnosed with a
chest contusion; neck and lumbar strain; and concussion without loss of
consciousness. (R. at 427.) On January 28, 2008, McCowan presented to the
emergency room with complaints of right shoulder and arm pain. (R. at 423-25.)
Examination of McCowan's right shoulder showed full range of motion and no
dislocation. (R. at 423.) He was diagnosed with a right elbow sprain. (R. at 424.)

On August 1, 2009, McCowan presented to the emergency room at Norton
Community Hospital after hitting his head on a car door. (R. at 420-22.) He denied
loss of consciousness. (R. at 420.) The wound was irrigated and closed with
dermabond. (R. at 421.) McCowan was diagnosed with a laceration to the scalp.
(R. at 421.) On August 6, 2009, McCowan presented to the emergency room with
complaints of low back pain and stiffness after lifting heavy boxes at work. (R. at
417-19.) He was diagnosed with acute lumbosacral strain. (R. at 418.) On August
8, 2009, McCowan presented to the emergency room at Mountain View with
complaints of back pain. (R. at 437-38.) Dr. Jack K. Cox, II, M.D., diagnosed acute
low back pain. (R. at 438.)

On September 16, 2009, McCowan was seen at Dickenson County
Behavioral Health for crisis intervention for depression and a pornography
addiction. (R. at 366-67.) He stated that, he would substitute alcohol for
pornography when he could not view pornography. (R. at 366.) Brian R. O'Quinn,

Q.M.H.P., a qualified mental health professional, diagnosed anxiety state, unspecified and alcohol abuse, episodic. (R. at 367.) O'Quinn assessed McCowan's then-current Global Assessment of Functioning, ("GAF"),[7] score at 70.[8] (R. at 367.) On April 26, 2010, services were terminated due to non-compliance. (R. at 368-69.) It was noted that McCowan's GAF score at that time was 65. (R. at 369.) On April 18, 2011, McCowan's mother requested intervention, stating that McCowan had a sex addiction and problems with decision making. (R. at 364-65.) She reported that her daughter cleaned McCowan's home and found empty cases of beer. (R. at 365.) O'Quinn diagnosed anxiety state, unspecified; and alcohol abuse, episodic. (R. at 365.)

On October 17, 2011, McCowan presented to the emergency room at Mountain View for complaints of back pain. (R. at 433-34.) He was diagnosed with acute low back pain and myofascial lumbar and thoracic sprain/strain. (R. at 434.)

On June 20, 2013, Kathy Birchfield, M.Ed., a licensed senior psychological examiner,[9] evaluated McCowan at the request of Disability Determination Services. (R. at 396-99.) McCowan stated that he did not usually have any depression. (R. at 397.) He stated that he played video games; helped care for his

_____

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[8] A GAF score of 61-70 indicates "some mild symptoms ... OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well ...." *See* DSM-IV at 32.

[9] This report was also signed by Diane L. Whitehead, Ph.D., a licensed clinical psychologist, on July 1, 2013. (R. at 399.)

infant daughter; mowed the yard; helped his neighbor; helped with all the household chores; and cooked. (R. at 397-98.)

Birchfield reported that McCowan's mood was positive and cooperative; his affect was congruent to mood; he maintained adequate eye contact; his speech was appropriate and relevant; his thought processes were logical and within normal range; his recent and remote memory were intact; his concentration and attention were adequate; he displayed no evidence of psychomotor agitation or retardation; there was no psychotic process present; his thought content and stream of conversation were rational and alert; he was able to recall 3/3 items after initial delay and 2/3 items after a time delay; he was able to provide adequate meaning to 2/4 common proverbs; and he was able to perform serial threes. (R. at 398.) Birchfield diagnosed a learning disorder, not otherwise specified, and possible borderline intellectual functioning. (R. at 399.) She assessed McCowan's then-current GAF score at 50[10] to 55.[11] (R. at 399.) Birchfield opined that McCowan could make simple work-related decisions and carry out simple instructions; he would have difficulty maintaining and understanding complex information or instructions; he may have difficulty working in coordination with groups of people and in maintaining socially appropriate behavior due to reported anger issues; he was capable of maintaining basic standards of neatness; and he could respond appropriately to changes in the work setting. (R. at 398.)

---

[10] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning…." *See* DSM-IV at 32.

[11] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...." *See* DSM-IV at 32.

On June 25, 2013, Dr. Brett S. Compton, O.D., examined McCowan at the request of Disability Determination Services. (R. at 390-93.) Dr. Compton reported that McCowan's best correction vision of the right eye was 20/20 and his best corrected vision of the left eye was 20/400. (R. at 390.) Anterior and posterior segment examinations revealed normal structures and the pupils and confrontation fields were basically normal in both eyes. (R. at 390.) Both eyes displayed zero degrees visual field, and, Dr. Compton noted that there was no physical reason for the greatly reduced visual field. (R. at 390.) He diagnosed strabismic amblyopia of the left eye since birth. (R. at 390.) He reported that McCowan was legally blind in his left eye, but had normal vision in his right eye. (R. at 390.) Dr. Compton opined that McCowan had the ability to participate in the normal workforce, but that care must be taken to protect his good eye.[12] (R. at 390-91.)

On July 3, 2013, Eric Oritt, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that McCowan had mild limitations in his activities of daily living; experienced mild difficulties in maintaining social functioning; experienced moderate difficulties in maintaining concentration, persistence or pace; and had experienced no repeated episodes of decompensation for extended duration. (R. at 90-91.)

That same day, Oritt completed a mental assessment, indicating that McCowan was moderately limited in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended

---

[12] The record shows that Dr. Compton was contacted by Disability Determination Services to determine McCowan's behavior during the examination. (R. at 294.) It was reported that Dr. Compton stated that McCowan walked into the office without assistance and moved about the examination room without assistance or difficulty. (R. at 294.) It is noted that McCowan was possibly malingering.

periods; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 94-96.) Oritt stated that McCowan's mental work-related abilities were, otherwise, not significantly limited.

On July 18, 2013, Dr. Shirish Shahane, M.D., a state agency physician, opined that McCowan had no exertional limitations. (R. at 92-94.) He found that McCowan had an unlimited ability to climb ramps and stairs, to balance, to stoop, to kneel, to crouch and to crawl; and that he could never climb ladders, ropes or scaffolds. (R. at 93.) Dr. Shahane noted that McCowan should avoid working around heights and hazards due to blindness in his left eye. (R. at 93.) He found that McCowan had limited near and far acuity, depth perception, accommodation, color vision and field of vision in the left eye. (R. at 93.) No manipulative or communicative limitations were noted. (R. at 93-94.)

On December 26, 2013, Dr. Gary C. Hubbard, O.D., an optometrist, reported that McCowan's best corrected acuity in the right eye was 20/30 and 20/80 in the left eye. (R. at 444.) Dr. Hubbard noted that McCowan's anterior and posterior segment examinations were normal. (R. at 444.)

On April 21, 2014, McCowan was seen by Crystal Burke, L.C.S.W., a licensed clinical social worker, complaining of mood swings. (R. at 454.) He reported an erratic sleep cycle and fatigue. (R. at 454.) McCowan stated that he had

not worked in 18 months, stating that he was fired from his previous job for missing too much work. (R. at 454.)  He stated that he had a nine-month-old daughter, but that his mother had custody of her due to Child Protective Service intervention. (R. at 454.) McCowan stated that he did not drive due to his license being suspended. (R. at 454.) Burke reported that McCowan initiated conversation; he was cooperative; his thought content was clear and logical; he had a depressed mood with congruent affect; and poor judgment and insight. (R. at 454.) She noted that McCowan had some significant situational stressors. (R. at 454.) Burke diagnosed unspecified episodic mood disorder. (R. at 454.)

On June 26, 2014, McCowan presented to the emergency room at Norton Community Hospital with complaints of left hand pain and pain in his right index finger. (R. at 562-64.) His examination was normal with the exception of positive Tinel's and Phalen's sign. (R. at 563.) He was diagnosed with questionable carpal tunnel syndrome and tendonitis. (R. at 563.)

On July 7, 2014, McCowan was seen at the emergency room at Mountain View with complaints of left hand, wrist and arm pain. (R. at 674-81.) He denied myalgias, back pain, arthralgias, behavior problems and confusion. (R. at 675.) McCowan exhibited tenderness over the left median nerve, especially on palpation, and his mood, affect and behavior were normal. (R. at 676.) X-rays of McCowan's left wrist were normal. (R. at 681.) Dr. Cox diagnosed left upper extremity pain. (R. at 677.)

On August 12, 2014, Jo McClain, Psy.D., a state agency psychologist, completed a PRTF indicating that there was insufficient evidence to determine the presence of a disorder. (R. at 123-24.) It was noted that McCowan was scheduled

for a consultative evaluation in July 2014, but failed to keep the appointment. (R. at 124.)

On August 18, 2014, McCowan presented to the emergency room at Mountain View with complaints of left groin pain. (R. at 404-07.) He denied myalgias, back pain, arthralgias, behavior problems and confusion. (R. at 405.) Dr. Cox reported that McCowan was in no acute distress; he had normal range of motion of his neck; he exhibited no edema or tenderness; and his mood, affect and behavior were normal. (R. at 405.) A CT scan of McCowan's pelvis showed left inguinal adenopathy with an enlarged node with surrounding inflammatory change and intrapelvic soft tissues showed mild diverticulosis of the sigmoid. (R. at 408.) Dr. Cox diagnosed inguinal pain. (R. at 405.) On November 17, 2014, McCowan presented to the emergency room at Mountain View for complaints of abdominal pain. (R. at 409-15.) He denied myalgias, back pain, arthralgias, behavior problems and confusion. (R. at 410.) Dr. Cox reported that McCowan was in no acute distress; he had normal range of motion of his neck; his musculoskeletal examination showed normal range of motion and exhibited no edema or tenderness; and his mood, affect and behavior were normal. (R. at 410.) A CT scan of McCowan's abdomen and pelvis was normal. (R. at 412.) McCowan was diagnosed with abdominal pain. (R. at 410.)

On March 16, 2015, McCowan presented to the emergency room at Norton Community Hospital with complaints of increased arm pain. (R. at 531-33.) He was diagnosed with wrist pain and carpel tunnel syndrome. (R. at 532.) On May 5, 2015, McCowan presented to the emergency room for complaints of low back pain after he fell playing basketball. (R. at 495-97.) It was noted that McCowan's musculoskeletal examination showed intact strength and range of motion. (R. at

496.) His neurological examination was intact, and his psychiatric examination was normal. (R. at 496.) He was diagnosed with back pain. (R. at 496.)

On November 8, 2015, McCowan presented to the emergency room at Lonesome Pine with complaints of hand pain. (R. at 590-97.) McCowan denied back pain; decreased range of motion; fatigue; muscle weakness; tingling; behavioral problems; and confusion. (R. at 591-92.) It was noted that McCowan had normal neck and musculoskeletal range of motion and normal mood, affect and behavior. (R. at 592.) Examination of McCowan's left ring finger showed a partially healed laceration with erythema; intact pulses and sensation; and limited range of motion. (R. at 593.) McCowan said that he cut his finger on a saw at work a week earlier. (R. at 593.) X-rays of McCowan's left hand were normal. (R. at 593, 597.) On March 6, 2016, McCowan presented to the emergency room at Lonesome Pine for complaints of headaches. (R. at 578-84.) He denied myalgias, back pain, arthralgias, neck pain and stiffness, behavioral problems and confusion. (R. at 580.) It was noted that McCowan had normal range of motion; normal mood and affect; normal speech and behavior; normal thought content; and normal cognition and memory. (R. at 581.) A CT scan of McCowan's head was normal. (R. at 584.) McCowan was diagnosed with migraine without status migrainosus, intractable, and nausea. (R. at 582.)

On March 30, 2016, Dr. Hubbard reported that McCowan's best corrected acuity in the right eye was 20/20 and 20/80 in the left eye. (R. at 456.) He noted amblyopia of the left eye. (R. at 456.) Dr. Hubbard reported that McCowan's anterior and posterior segment examinations were normal. (R. at 456.)

On June 14, 2016, Paige Cordial, Psy.D., a licensed clinical psychologist, evaluated McCowan at the request of McCowan's attorney. (R. at 683-89.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and McCowan obtained a full-scale IQ score of 69. (R. at 687.) The Wide Range Achievement Test, Fourth Edition, ("WRAT-IV"), was administered, and McCowan's scores indicated that he had deficits in all areas of basic academic skills. (R. at 687.) Results of achievement testing ranged from extremely low in math computation to low average in word reading. (R. at 687.) Cordial diagnosed borderline intellectual functioning; ADHD, combined type, severe; tobacco use disorder; and recurrent major depressive disorder with anxious distress. (R. at 689.)

That same day, Cordial completed a mental assessment, indicating that McCowan had a slight limitation in his ability to maintain personal appearance. (R. at 690-92.) She opined that McCowan had a satisfactory ability to follow work rules; to relate to co-workers; to deal with the public; to interact with supervisors; and to understand, remember and carry out simple job instructions. (R. at 690-91.) Cordial opined that McCowan had an unsatisfactory ability to use judgment; to interact with supervisors; to deal with work stresses; to function independently; to maintain attention and concentration; to understand, remember and carry out detailed job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 690-91.) She found that McCowan had no useful ability to understand, remember and carry out complex job instructions. (R. at 690-91.) Cordial found that McCowan could not manage his own benefits and that he would be absent from work more than two days a month. (R. at 692.)

On July 7, 2016, Alysia Hoover-Thompson, Psy.D., a licensed clinical psychologist, evaluated McCowan. (R. at 694-96.) McCowan stated that he lived with his mother, step-dad and daughter and that he took "care of everything around the house." (R. at 694.) McCowan reported that, in the past, he abused alcohol, marijuana and opiates, but that he quit "cold turkey" three years prior. (R. at 694.) Hoover-Thompson reported that McCowan's mood was mildly depressed with a congruent affect and his insight and judgment were within normal limits. (R. at 694.) Hoover-Thompson diagnosed borderline intellectual functioning; ADHD, combined type; and recurrent, moderate major depressive disorder with anxious distress. (R. at 689.)

On July 22, 2016, Cordial completed another mental assessment,[13] indicating that McCowan had a slight limitation in his ability to maintain personal appearance. (R. at 698-700.) She opined that McCowan had a satisfactory ability to understand, remember and carry out simple job instructions. (R. at 698-99.) Cordial opined that McCowan had an unsatisfactory ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to deal with work stresses; to function independently; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 698-99.) She found that McCowan had no useful ability to maintain attention and concentration and to understand, remember and carry out complex and detailed job instructions. (R. at 698-99.) Cordial found that McCowan could not manage his own benefits and that he would be absent from work more than two days a month. (R. at 700.)

---

[13] There is nothing in the record to show that Cordial saw McCowan subsequent to his initial evaluation on June 14, 2016.

## III.  Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2018). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2018).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute

its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975).  Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if she sufficiently explains her rationale and if the record supports her findings.

McCowan argues that the ALJ erred by failing to find that he met or equaled the criteria for the listing for intellectual disability[14] found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05C. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.) For the following reasons, I find this argument unpersuasive.

---

[14] Effective September 3, 2013, the Social Security Administration changed the terminology in Listing 12.05 from "mental retardation" to "intellectual disability." Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46499 (Aug. 1, 2013) (to be codified at 20 C.F.R. Pt. 404, Subpt. P, App. 1).

The regulations explain that a claimant may not meet the intellectual disability listing unless his "impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria…." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A (2016). The introductory paragraph states that "[i]ntellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2016). Deficits in adaptive functioning refer to "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Pt. 404. Subpt. P, App. 1, § 12.00(C)(1).

McCowan's condition must then meet two additional requirements: (1) a valid verbal, performance or full-scale IQ score of 60 through 70 and (2) a physical or other mental impairment imposing additional and significant work-related limitation of function. The Secretary's regulations do not define the term "significant." However, this court previously has held that it must give the word its commonly accepted meanings, among which are, "having a meaning" and "deserving to be considered." *Townsend v. Heckler*, 581 F. Supp. 157, 159 (W.D. Va. 1983). In *Townsend*, the court also noted that the antonym of "significant" is "meaningless." *See* 581 F. Supp. at 159. The regulations do provide that "where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App.

1, § 12.00(D)(6)(c) (2016); *see Flowers v. U.S. Dep't of Health & Human Servs.*, 904 F.2d 211 (4th Cir. 1990).

The ALJ found that the evidence indicated that McCowan's level of adaptive functioning was not in the range of intellectual disability. (R. at 25.) The ALJ noted that McCowan reported that he cared for his infant daughter, prepared meals, helped with household chores, mowed his yard, helped his neighbor, watched television and played video games. (R. at 29, 397-98, 694.) It is noted that McCowan's past work as a truck helper/hoisting laborer and telephone order clerk were classified as semi-skilled work. (R. at 73-74.)

The record contains two sets of IQ scores. McCowan's school records indicate that, while in the fifth grade, McCowan obtained a verbal IQ score of 82, a performance IQ score of 71 and a full-scale IQ score of 75. (R. at 335.) In June 2016, the WAIS-IV was administered, and McCowan obtained a full-scale IQ score of 69. (R. at 687.) Regardless of obtaining a full-scale IQ score of 69, Cordial, upon whose assessment McCowan relies, diagnosed only borderline intellectual functioning. (R. at 689.) In 2013, Birchfield diagnosed a learning disorder, not otherwise specified, and possible borderline intellectual functioning. (R. at 399.) In July 2016, Hoover-Thompson diagnosed borderline intellectual functioning. (R. at 689.)

In June 2013, Birchfield noted that McCowan's mood was positive and cooperative; his affect was congruent to mood; he maintained adequate eye contact; his speech was appropriate and relevant; his thought processes were logical and within normal range; his recent and remote memory were intact; his concentration and attention were adequate; he displayed no evidence of

psychomotor agitation or retardation; there was no psychotic process present; his thought content and stream of conversation were rational and alert; he was able to recall 3/3 items after initial delay and 2/3 items after a time delay; he was able to provide adequate meaning to 2/4 common proverbs; and he was able to perform serial threes. (R. at 398.) Birchfield opined that McCowan could make simple work-related decisions and carry out simple instructions; he would have difficulty maintaining and understanding complex information or instructions; he was capable of maintaining basic standards of neatness; and he could respond appropriately to changes in the work setting. (R. at 398.)

In July 2013, state agency psychologist Oritt, found that McCowan had mild limitations in his activities of daily living; experienced mild difficulties in maintaining social functioning; experienced moderate difficulties in maintaining concentration, persistence or pace; and had experienced no repeated episodes of decompensation for extended duration. (R. at 90-91.) In April 2014, Burke noted that McCowan initiated conversation; he was cooperative; and his thought content was clear and logical. (R. at 454.) In July 2016, Hoover-Thompson reported that McCowan's insight and judgment were within normal limits. (R. at 689.) The record shows that McCowan denied behavior problems and confusion, and it was repeatedly reported that McCowan's neurological and psychiatric examinations were normal. (R. at 405, 410, 496, 580-81, 591-92, 675.) Furthermore, McCowan reported that he played video games; helped care for his infant daughter; mowed the yard; helped his neighbor; helped with all the household chores; and cooked. (R. at 397-98, 694.) In addition, in 2016, McCowan reported that, he lived with his mother, step-dad and daughter, and he took "care of everything around the house." (R. at 694.)

Based on the above, I find that significant evidence exists to support the ALJ's finding that McCowan did not meet or equal the listing for §12.05(C).

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's finding that McCowan did not meet or equal the listing for § 12.05(C); and

2. Substantial evidence exists in the record to support the Commissioner's finding that McCowan was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny McCowan's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2018):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as

provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      November 2, 2018.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE